**GREAT AMERICAN INSURANCE COMPANY, a corporation organized and existing under the laws of the State of New York, Plaintiff,**

v.

**T. Keith MARSHALL, Jr., as Administrator of the Estate of James E. Darling, Robert B. Burns and Floyd L. Fonck, Defendants.**

Civ. A. No. 66–715.

United States District Court
D. South Carolina,
Charleston Division.
March 30, 1967.

Robert A. Patterson, of Barnwell, Whaley, Stevenson & Patterson, Charleston, S. C., for plaintiff.

Orian A. Manucy, of Maybank & Manucy, Charleston, S. C., for defendant Burns.

Lester E. Stringer, Charleston, S. C., for defendant Fonck.

Ira J. Bloom, of Pritchard, Myers & Morrison, Charleston, S. C., for defendants Marshall and Darling.

## ORDER

HEMPHILL, District Judge.

The plaintiff instituted its action for a declaratory judgment determination whether it covered the defendant Fonck and was thus liable for an accident in which Fonck was driving Burns's 1963 Ford Thunderbird. Coverage as to Burns himself is not denied. Burns appeared specially, however, and moved to quash service of process as to him. Fonck is in default. The facts as revealed by the depositions introduced are as follows.

Robert B. Burns owned a 1963 Ford Thunderbird automobile which was insured for theft and liability insurance by The Great American Insurance Company. Burns and Floyd L. Fonck shared an apartment together in Winston-Salem, North Carolina. There was an extra set of keys to the automobile which Fonck used. Fonck had made charges on a Texaco credit card issued to Mr. Burns prior to June 18, 1966, but Burns denied knowledge of these charges until August of 1966. The charges were signed Robert B. Burns but Burns denied these signatures as being his.

On occasions Mr. Fonck had driven this automobile around town in Winston-Salem and had driven it out of town when Mr. Burns was with him. When he was to take the automobile overnight without Mr. Burns being present, he would advise Mr. Burns. He took the automobile out of town without Mr. Burns being present only on one previous occasion. That time he was granted permission. The trip was to Greensboro, North Carolina which is less than one hundred miles from Winston-Salem. He left at 3:00 o'clock in the afternoon and came back around 2:00 o'clock in the morning. Fonck had never otherwise driven the automobile outside of Winston-Salem without the express permission of Burns.

On June 18, 1966, Burns left Winston-Salem by plane for New Jersey and New Hampshire. The Thunderbird was left at the apartment house. After Burns left, Mr. Fonck took the automobile and departed from Winston-Salem on June 18, 1966 and headed for Tampa, Florida, taking the Texaco credit card with him. He was going to Tampa to give himself up, having jumped bond there on a breaking and entering and grand larceny charge. When he reached the Tampa area he changed his mind and did not

give himself up. He stayed there for about ten days. He next went to Cocoa Beach for a day and a half, then headed toward North Carolina on U. S. Highway No. 17. He was still travelling alone, and charging gas on Burns's Texaco card. He stopped for approximately a week in Lexington, North Carolina which is not far from Winston-Salem. He wanted to take the car back to Burns saying nothing to him about it and leave town again on a bus, but for some reason he decided instead to return to Florida. Enroute he had an accident at Charleston, South Carolina on July 15, 1966. During approximately twenty-eight days in which he had the car he never talked with Mr. Burns nor did he write to him despite his proximity to Winston-Salem.

The accident occurred on U. S. Highway No. 17 at approximately 11:00 o'clock p.m. on July 15, 1966. It was raining at the time and Fonck was attempting to pass a white Chevrolet. He ran head on into an approaching motorcycle killing both riders of the cycle. Fonck is now in jail in Florida.

Burns returned to Winston-Salem on June 22, 1966 and discovered that both his automobile and Fonck were missing. He called several friends who knew Fonck to inquire of his whereabouts. This brought no results. On Wednesday night, June 22, 1966 he made a complaint to the Winston-Salem Police Department, and again on Friday, June 24, 1966. After talking with the Lieutenant of Detectives he offered to swear out a warrant but decided not to. He told the police that there was a definite possibility that Fonck had gone to Tampa, Florida, as this was his hometown and he had friends there. Sometime in July the Winston-Salem Police Department contacted Burns and told him that they had contacted the Tampa Police and learned that Fonck and the automobile were in Tampa.

Mr. Burns carried theft insurance as well as liability with The Great American Insurance Company. On Friday, June 24, 1966, Mr. Burns called The Great American Insurance Company's office and talked to a claims man. At this time he reported that his car had been stolen and that on two occasions he had talked to the police. The police had issued a missing car report. On June 27, 1966 he went to the office of Great American and filed a claim for theft loss. On Friday, July 1, 1966 he again visited the claims office and signed over the title to his car to The Great American Insurance Company. At this time he received a $2,050.00 check from The Great American Insurance Company. He also reported to Texaco that his credit card was missing. No more charges were paid on the card after this report.

The only contradiction in the testimony of Mr. Burns and Mr. Fonck is that Mr. Burns testified that he had never given Fonck permission to make charges against his Texaco credit card and that he did not even know Fonck had his Texaco credit card on June 18, 1966. Fonck testified, to the contrary, that Mr. Burns had given him the Texaco credit card and knew that he had made charges either on it or on a Gulf credit card.

The insurance policy defines "Persons Insured" as follows:

"The following are insureds under Part I:

(a) with respect to the owned automobile,

(1) the named insured and any resident of the same household,

(2) any other person using such automobile, with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission."

The inquiry here is whether the use of Burns's Thunderbird by Fonck on July 15, 1966 was within the coverage quoted. Counsel agree that the law of North Carolina is controlling.

Fonck does not qualify as a "resident of the same household" as Burns within the meaning of the policy. Webster's International Dictionary of the English Language, Second Edition, 1946,

defines resident as "one who resides in a place" or "one who dwells in a place for a period of more or less duration." "Resident usually implies more or less permanence of abode, but is often distinguished from inhabitant as not implying great fixity or permanency of abode." Id. Residency also implies "dwelling, or having an abode, for a continued length of time." Id. The critical lack of permanence is established here by two factors: the brief duration of Fonck's stay and the fact that Fonck had departed with the intention of going back to Tampa and giving himself up.[2]

■ Fonck cannot be said to be a member of Burns's household either according to usual and accepted meaning of the term household. The term "household" in such a provision in an insurance policy means those who dwell under the same roof and compose a family. Andrews v. Commercial Casualty Ins. Co., 128 Neb. 496, 259 N.W. 653. Fonck was not a member of the family. Even had he been so, his temporary stay and the period of his departure would negate that status. In Lumbermen's Mut. Cas. Ins. Co. v. Pulsifer, 41 F.Supp. 249, 252 (D.C. Me.) the court held that a married son of insured who had previously left the parental home but who thereafter came back and temporarily resided with the insured while attempting to find a residence to rent was not a "member of the household" of insured. In this instant action the court notes that Fonck in his deposition stated that Burns told him that he "didn't have to pay rent until * * * [he] got settled down and went to work." Counsel for the defendant administrator stated on brief:

> The fact that title to the subject vehicle covered by the policy in question had been transferred from Burns to Great American prior to the collision out of which the claim arises under the liability section of the policy is not significant. Nor is the point argued by plaintiff's counsel—that Great American was under no legal duty

under the theft provision of the policy to pay Burns for the loss of his Thunderbird—of any significance. Nor is the court impressed with plaintiff's counsel's argument that Fonck comes within the definition of a 'named insured' as a member of Burns' household. This case must turn on the question whether or not Fonck at the time of the collision on July 15, 1966 was using the vehicle with Burns' permission and if so, whether or not at the time his actual use was within the scope of his permission.

Does the use by Fonck fall within the permissive provisions of the insurance contract? This court is of the opinion that it does not.

■ The more usual case involving "permissive use" arises where an employee has an accident while using his employer's vehicle and coverage under the employer's policy is contested. The *strict rule, or the conversion rule,* holds that no coverage is afforded unless permission, either express or implied, is given to the employee to not only use the car in the first instance but also to use the car at the particular time in question. Under the *liberal* rule the employee need only have received permission to use the car in the first instance: any use while it remains in his possession is "with permission", though that use may be for a purpose not contemplated by the assured when he parted with possession of the vehicle. The third rule is the *moderate,* or the *minor deviation rule.* This would allow a slight deviation from the scope of the authority or permission granted, but it would disallow coverage where there is a material deviation from the purpose contemplated by the permission granted. See Annot. 5 A.L.R. 600, 622.

In Hooper v. Maryland Casualty Co., 233 N.C. 154, 63 S.E.2d 128 (1951), relied on by both counsel, does not unequivocally commit North Carolina to any doctrinal rule. However, the minor deviation or moderate rule was seemingly

2. See Fonck's deposition of January 27, 1967.

applied in that case in the following manner:

> The permission which puts the omnibus or extended coverage clause of the policy into operation may be either express or implied. * * * But whether the permission be expressly granted or impliedly conferred, it must originate in the language or the conduct of the named insured or of some one having authority to bind him in that respect. * * *

> The answer to the minor question presented by the plaintiff's appeal is to be found in this principle. Glenn could not define or enlarge the scope of his permitted use of his employer's truck by anything said or done by him without the knowledge of his employer, or its proper representatives.

This application would clearly exclude a consideration of the *liberal rule* by the North Carolina court.

Williams v. Travelers Insurance Company, 265 F.2d 531 (4th Cir. 1959), presented a factual situation involving an employer and his employee. A mechanic employed by the insured's garage was instructed to test a repaired vehicle by driving it home for the night and returning with it to work. Instead, after dinner at home he and his family drove some twenty-six miles to see a friend, and they had an accident on the return trip. The court ruled against coverage by the garage owner's insurer in terms appropriate to the instant case.

It is our opinion that in this state of the evidence the judgment of the District Court was correct. It is well established in this circuit and elsewhere that a person who is given permission to drive an automobile for a limited purpose does not fall within the scope of the omnibus clause, so as to be within the meaning of the term "insured", when he goes beyond the permissive use and drives the car for purposes of his own. * * *

No evidence was offered in the case tending to show that a road test of an automobile under repair could, by any stretch of the imagination, include the extensive use to which the car was put in this instance.

Examining the use here in the light of those two decisions the court finds that there is insufficient credible evidence that Burns's permission to Fonck contemplated, included, or implied the driving of the Thunderbird on a trip of over 300 miles lasting for some twenty-eight days. That deviation from the original permission is gross by any reasonable standard. Under the North Carolina cases the liberal or so-called "hell or high water rule", is not applicable.[3] By either the *moderate* or the *strict rule* it is clear that Fonck's use of the car was not a permissive use and that it was not covered by the policy.

3. Grassie v. Moskowitz, No. 8579 D.S.C. March 27, 1967 (unreported), made the following analysis:
It is argued that since Jordan originally received possession of the Oldsmobile on April 4, 1964, with the permission of Mrs. Moskowitz he is covered by the policy. With respect to permission there are two rules applied in circumstances such as are involved in this case. The majority of jurisdictions adhere to the "conversion rule" which holds that when the use of the car by the bailee sufficiently exceeds the scope of permission to make the bailee liable to the insured for conversion, such use is not covered by the policy. 7 Appleman, Insurance Law and Practice § 4367 (1962). Some states, however, apply what is referred to as the "hell or high water rule" which holds that once the car is entrusted with the permission of the named insured, the use of the car is within the scope of the permission coverage regardless of how severely the terms of the bailment were violated. 7 Appleman, Insurance Law and Practice § 4365 (1962). This insurance contract as well as the permission granted was made and given in North Carolina, wherefore the law of North Carolina must be applied to determine coverage. North Carolina follows the "conversion rule". Williams v. Travelers Ins. Co., 265 F. 2d 531 (4th Cir. 1959); Hooper v. Maryland Cas. Co., 233 N.C. 154, 63 S.E.2d 128 (1951). This court holds that Jordan's deviation amounted to a conversion and that United Services policy does not cover Bobby Jordan as an insured.

The Clerk will enter judgment that the plaintiff is not liable to any of the parties to this proceeding because of the actions of defendant Fonck concerning the accident of July 15, 1966.

And it is so ordered.